TARSHIS, CATANIA, LIBERTH,
  MAHON & MILLIGRAM, PLLC
Attorneys for the Plaintiffs,
One Corwin Court, PO Box 1479
Newburgh, New York 12550
(845) 565-1100
Richard M. Mahon, II (RM-9260)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JAMES L. KEHOE and J. DUNCAN URQUHART,

                                    Plaintiffs,

            -against-

PANORAMA LABS PTY, LIMITED, PANORAMAFLAT
LIMITED, ST SYNERGY LIMITED, ENTREPRENEURS
IN RESIDENCE PTY, LIMITED, GREGORY S. RIEBE,
IAN SPENCELEY and JOHN ATHANS,

                                    Defendants.
-----------------------------------------------------------------X

*Judge Robinson*

**COMPLAINT**

Docket No.

**07-CV-3168**

            The plaintiffs, JAMES L. KEHOE and J. DUNCAN URQUHART, by and through their

attorneys, TARSHIS, CATANIA, LIBERTH, MAHON & MILLIGRAM, PLLC, complaining

against the defendants, allege as follows:

## PRELIMINARY STATEMENT

            1.      This action seeks monetary, equitable and declaratory relief and costs, expenses

and attorneys' fees under the Laws of the United States, Western Australia and/or the State of

New York and pursuant to 28 U.S.C. §§ 2201 and 2202 and the Federal Rules of Civil

Procedure.

            2.      This action seeks relief and damages on behalf of plaintiffs based on causes of

action for (1) declaratory judgment in accordance with 28 U.S.C. §§ 2201 and 2202; (2) breach

of contract; (3) fraud and deceit; (4) breach of implied and/or express covenants of good faith, best efforts and fair dealing; (5) tortious interference with business and contractual relations; (6) *prima facie* tort; (7) promissory estoppel and unjust enrichment; (8) an accounting; and (9) breach of fiduciary duties.

## JURISDICTION

3.     The Federal and pendent state claims arise under the laws of the United States, Western Australia and/or the State of New York.

4.     Jurisdiction is proper pursuant to 28 U.S.C. §§ 1332 based on diversity of citizenship and the amount in controversy. Jurisdiction is further based on the Court's pendent jurisdiction over questions of state and/or foreign law arising from the same operative facts.

## VENUE

5.     This action properly lies in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391 because the claims arose in this District; the plaintiffs reside in this District; and because one or more of the defendants have transacted business in this District.

6.     This Court has jurisdiction over all claims and the parties in this action because the actions giving rise to the claims pleaded occurred within this judicial district.

## PARTIES

7.     Plaintiff, JAMES L. KEHOE ("KEHOE") is a natural person residing at 511 Angola Road, Cornwall, New York 12518.

8.     Plaintiff, J. DUNCAN URQUHART ("URQUHART") is a natural person residing at 29 Hollow Road, Staatsburg, New York 12580.

2

9.    Upon information and belief, PANORAMAFLAT LIMITED ("PANORAMA FLAT"), was established as a foreign company organized and existing under the laws of Western Australia on or about November 7, 2003 and identified by Australian Company Number 106 969 939, with offices at 1 Sarich Way, Technology Park, Bentley, Western Australia 6102 and 17 Foley Street, Balcatta, Western Australia 6021.    Upon further information and belief, PANORAMA FLAT changed its name to PANORAMA LABS PTY, LIMITED during 2005 ("PANORAMA LABS").

10.    Upon information and belief, PANORAMA FLAT applied for and received authority from the New York State Department of State to operate as a foreign corporation in New York on June 30, 2005 pursuant to Section 1304 of the New York Business Corporation Law.

11.    Upon information and belief, PANORAMA FLAT, now PANORAMA LABS, maintains New York offices at 703 Grant Avenue, Lake Katrine, New York 12449; 1230 Avenue of the Americas, New York, New York 10020; and Post Office Box 242, Clinton Corners, New York 12514.

12.    Upon information and belief, PANORAMA FLAT/PANORAMA LABS further maintains offices in the States of Colorado and California and in the Country of Japan.

10.    Upon information and belief, PANORAMA LABS has continued as the putative successor in interest to PANORAMA FLAT since 2005 as the result of the purported name change effective during 2005.

11.    Upon information and belief, despite the name change, PANORAMA LABS and PANORAMA FLAT share virtually the same investors, offices, bank accounts, corporate directors and corporate officers.

12. Because of the claims pleaded and the nature of the relationship between PANORAMA FLAT and PANORAMA LABS, both entities are necessary and proper party defendants to this action in order for the Court to award the full relief requested herein.

13. Upon information and belief, ST SYNERGY LIMITED ("SYN") is a foreign company organized and existing under the laws of Western Australia with offices at 17 Foley Street, Suite 2, Balcatta, WA, Australia 6021, one of the same addresses used by PANORAMA LABS and PANORAMA FLAT.

14. Upon information and belief, SYN is listed as a publicly traded company on the Australian Securities Exchange and owns approximately 51% of the outstanding shares of PANORAMA LABS.

15. Upon further information and belief, SYN's Chairman, Executive Director and Managing Director is defendant JOHN ATHANS who also serves as a Director on the Board of Directors of PANORAMA LABS.

16. Because of the claims pleaded and the nature of the relationship between SYN and defendants PANORAMA FLAT and PANORAMA LABS, SYN is a necessary and proper party defendant to this action in order for the Court to award the full relief requested herein.

17. Upon information and belief, defendant ENTREPRENEURS IN RESIDENCE PTY, LIMITED ("EIR") is a foreign company organized and existing under the laws of Western Australia with offices at 1 Sarich Way, Technology Park, Bentley, Western Australia 6102, one of the same addresses also used by PANORAMA FLAT.

18. Upon information and belief, EIR owns approximately 6.56 % of the outstanding shares in PANORAMA LABS.

4

19.    Upon further information and belief, EIR's Chief Executive Officer is defendant GREGORY S. REIBE, also a Director on the Board of Directors of PANORAMA LABS.

20.    Because of the claims pleaded and the nature of the relationship between EIR and defendant PANORAMA LABS, EIR is a necessary and proper party defendant to this action in order for the Court to award the full relief requested herein.

21.    Upon information and belief, defendant GREGORY S. RIEBE ("RIEBE") is a natural person and a Director of PANORAMA LABS, maintaining his address care of EIR, 1 Sarich Way, Suite 4, Bentley, WA 6102.

22.    Because of the claims pleaded and the nature of the relationship between RIEBE and defendants PANORAMA LABS and EIR, RIEBE is a necessary and proper party defendant to this action in order for the Court to award the full relief requested herein.

23.    Upon information and belief, defendant IAN SPENCELEY ("SPENCELEY") is a natural person and a Director and the Vice President of Business Development of PANORAMA LABS, maintaining his principal residence at Silver Hills Apartments, #501, 2-12 Shirogane-cho, Shinjuku-ku, Tokyo, Japan 162-0816.

24.    Because of the claims pleaded and the nature of the relationship between SPENCELEY and defendant PANORAMA LABS, SPENCELEY is a necessary and proper party defendant to this action in order for the Court to award the full relief requested herein.

25.    Upon information and belief, defendant JOHN ATHANS ("ATHANS") is a natural person and a Director of PANORAMA LABS, maintaining an address care of ST SYNERGY LIMITED in Western Australia with offices at 17 Foley Street, Suite 3, Balcatta, WA, Australia 6021, one of the same addresses used by PANORAMA LABS and PANORAMA FLAT.

26.    Upon information and belief, ATHANS also serves as defendant SYN's Chairman, Executive Director and Managing Director. Upon further information and belief, SYN is the largest single investor in PANORAMA LABS.

27.    Because of the claims pleaded and the nature of the relationship between ATHANS and defendants PANORAMA LABS and SYN, ATHANS is a necessary and proper party defendant to this action in order for the Court to award the full relief requested herein.

## FACTUAL AVERMENTS

28.    PANORAMA LABS styles itself as a cutting-edge company pioneering the application of magneto-photonic crystal technology to the worldwide entertainment industry. Specifically, PANORAMA LABS is researching and developing, among other things, nanotechnology to produce the first magneto-photonic digital cinema projector.

29.    Upon information and belief, PANORAMA LABS currently devotes its research efforts to the development of brighter digital images, higher resolution graphics and more accurate color depictions for applications ranging from displays, projection, telecommunications and integrated circuits.

30.    Through its internal corporate division, Panorama Entertainment Systems, PANORAMA LABS has focused its magneto-photonic technology on entertainment applications such as digital cinema, public large-screen projection displays and alternative programming.

31.    According to the company's website (www.panoramalabs.com), PANORAMA LABS's photonics technology will target initial applications in large-area flat panel displays, theatrical and consumer video projectors and head-mounted displays for military, industrial and gaming applications.

6

32.    PANORAMA LABS touts proprietary technology offering "viewing angles, brightness, power efficiency and resolution (pixel density) beyond any technology on the market today."

33.    As detailed on the company's website, the heart of the PANORAMA LABS technology is the Magnetic Photonic Crystal ("MPC"). "The MPC makes use of the Faraday Effect, whereby polarized light is rotated by traveling through a magnetic field. The degree of that rotation is determined by the strength of the magnetic field."

34.    Upon information and belief, the company has at least one United States Patent and at least 33 patents pending for its proprietary technology.

35.    Upon information and belief, the company envisions broader applications for its core technology with contemplated nanotechnological advancements. The company currently performs research and development functions through a consortium of leading individuals, universities and IT companies in the field of nanotechnology.

36.    Upon information and belief, PANORAMA LABS and PANORAMA FLAT are related or identical companies with virtually identical investors, corporate officers, financial accounts, Board Members and places of business.

37.    On or about November 24, 2004, PANORAMA FLAT entered into an agreement with plaintiff KEHOE through which KEHOE would serve as the President and Chief Operating Officer of PANORAMA FLAT (the "KEHOE Agreement"). A copy of the KEHOE Agreement is annexed as Exhibit "A." In or about 2006, KEHOE became CEO of PANORAMA LABS.

38.    On or about January 1, 2005, PANORAMA FLAT entered in an agreement with plaintiff URQUHART through which URQUHART would serve as the Chief Financial Officer

7

of PANORAMA FLAT (the "URQUHART Agreement"). A copy of the URQUHART Agreement is annexed as Exhibit "B."

39.    The terms and conditions of the KEHOE and URQUHART Agreements were virtually identical in scope and content. Both documents employed the same "boilerplate" language except that plaintiff URQUHART was paid at the rate of $12,500 monthly instead of $15,000 monthly and he reported to the company President, KEHOE.

40.    Among other things, the KEHOE and URQUHART Agreements outlined (1) the services to be performed; (2) the term of the agreements; (3) the fees, commissions and stock options due KEHOE and URQUHART; and (4) the provisions for termination of the agreements.

41.    Under the terms of the KEHOE Agreement, plaintiff KEHOE was required to perform such reasonable duties as assigned by the Board of Directors and prepare such necessary reports directed by the Chief Executive Officer and Chief Technology Officer of PANORAMA FLAT.

42.    Even though KEHOE and URQUHART were each characterized as a "consultant" under their respective agreements, they were clearly functioning as traditional corporate employees working in excess of thirty hours per week and captive to the company's terms and conditions of employment.

43.    Section 2.1 of the KEHOE Agreement provides for a term commencing as of November 24, 2004 and continuing for a period of one year. Moreover, Section 2.2 of the KEHOE Agreement required that PANORAMA FLAT provide KEHOE a minimum of six (6) months notice before the expiration of the stated term in the event the company did not plan to renew the terms of his agreement.

8

44.    Section 2.3 of the KEHOE Agreement further provides that the agreement would self-renew for an additional one-year period unless earlier terminated with the requisite six months notice, or unless either party gave the other ninety (90) days prior written notice before the renewal date, that is, November 24th.

45.    In Section 3, the KEHOE Agreement provided for a threefold compensation package: (1) a base salary of $15,000 per month payable in advance on the first day of each month (the payments for November and December of 2004 were only in the amount of $12,000); (2) commissions, fees and bonuses; and (3) the Company agreed to negotiate in good faith with KEHOE to award stock options "in an amount typical of companies of similar size and financing and in similar stages of development." By the express terms of Section 3.3 of the KEHOE and URQUHART Agreements, those negotiations were required to commence no later than March 1, 2005.

46.    The KEHOE Agreement, in Section 5.1, permitted for-cause termination by KEHOE upon thirty (30) days written notice setting forth with specificity the grounds for termination for enumerated "causes" stated.

47.    The KEHOE Agreement, in Section 5.2, permitted for-cause termination by the company for enumerated causes stated.

48.    Throughout the term of the KEHOE Agreement neither KEHOE nor PANORAMA FLAT/PANORAMA LABS invoked the for-cause termination provisions contained in Sections 5.1 and 5.2.

49.    Section 5.3 of the KEHOE Agreement sets forth the provisions for "Termination by Company Without Cause." That section provides in its entirety as follows:

> In the event that Company has terminated Consultant's Agreement without cause, then this Agreement shall nonetheless be deemed

terminated, except that Company shall pay Consultant the monthly fee as it becomes due under Section 3.1 for the greater of (i) the remaining term of this Agreement or, (ii) six (6) months following the date of termination plus any bonus pro rated to termination date.

50.    Upon information and belief, KEHOE and URQUHART worked faithfully and diligently in accordance with the terms of their agreements and such agreements were extended after the first anniversary dates in November of 2005 and January of 2006, respectively.

51.    Upon information and belief, the above provisions of the KEHOE Agreement were identical to the provisions of the URQUHART Agreement.

52.    On or about May 22, 2006, defendant ATHANS sent e-mail correspondence to KEHOE which was not a termination notice in accordance with and as required under Section 2.3 of the Agreement.

53.    Instead, the ATHANS e-mail described a scenario applicable to all the Company's employees in which "the Board [of Directors] has asked [ATHANS] to officially confirm that all service contracts will not be extended in their current form" and directed KEHOE, as President and Chief Operating Officer, to formally advise the other "consultants" employed by Panorama Labs of the Board's position.

54.    Upon information and belief, the stated business purpose for ATHANS' proposed notice was that "the Board has reservations regarding the validity of the various consultant contracts. It is also due to the review of the Company's future alternatives as regards hiring people as either employees or consultants. A decision in this area will be made in the not too distant future." See ATHANS' letter dated May 22, 2006 annexed as Exhibit "C".

55.    By email dated May 23, 2006, KEHOE replied to ATHANS stating that he would "do as the Board has asked and notify all parties involved" but that he had certain concerns to

10

express to the Board regarding the sensitive nature and demoralizing effect of such an announcement.

56.    KEHOE proposed that the Board send notification letters to individual consultants, on a case-by-case basis, prior to the ninety (90) day notice date preceding their contract anniversary date. A copy of KEHOE's responsive email is annexed as Exhibit "D".

57.    By email dated May 23, 2006 at 8:19 p.m., ATHANS replied to KEHOE as follows: "Hi Jim, Will call you tonight to discuss – but be assured there are no mass sackings!!" At 8:43 p.m. on May 24, 2006, KEHOE emailed back:  "Hi John, I never thought that was the case and I wasn't personally concerned.  But I do know the reaction of at least a few individuals will not be at all good…"  Copies of the aforesaid e-mails are annexed as Exhibit "E".

58.    ATHANS subsequently requested that KEHOE prepare a revised draft letter to staff for discussion at the Board meeting. A copy of KEHOE's draft letter, as emailed on June 1, 2006, is annexed as Exhibit "F".  KEHOE's cover e-mail provided in relevant part as follows:

> All —Attached is a draft of a letter (we need to get one to Jim N. and Katie within the next week) providing notice that we do not plan to renew their Consulting Agreements.

59.    Ultimately, the Board adopted the recommendations and draft letter proposed by KEHOE, its CEO, and transmitted the same to the company consultants targeted for termination.

60.    On June 5, 2006, KEHOE emailed to Sutherland ("Sud") Ellwood, Director and Chief Strategic Officer of the Company, a letter for Ellwood's signature, addressed to company consultant, Kathryn Arons, of San Clemente, California, that was identical in substance to the KEHOE draft letter sent to the Board on June 1st. The letter was on Panorama Labs letterhead and was dated June 6, 2006. KEHOE's cover e-mail attaching the letter read: "Sud, Attached is the letter for Katie as we agreed at the Board meeting last week. …"  A copy of the letter is annexed hereto as Exhibit "G".

11

61.    On June 14, 2006 KEHOE transmitted a termination letter to yet another company consultant, James D. Noecker, of Saugerties, New York, that was identical in substance to the KEHOE draft letter sent to the Board on June 1st. The letter was on Panorama Labs letterhead and was signed by James Kehoe, CEO. See Letter attached as Exhibit "H".

62.    On June 16, 2006, KEHOE advised the Board via e-mail of the remaining letters setting forth the contract renewal dates and the 90 day notice dates as follows: James L. Kehoe (11/24, 8/26), Keith Davies (11/29, 8/31) and Duncan Urquhart (1/1, 10/3).

63.    Thereafter, and without warning, the employment and contractual rights of plaintiffs KEHOE and URQUHART were terminated without regard to prior written notice, ninety day (90) notice, outstanding compensation, commissions, bonuses and stock options payable.

64.    At all time referenced herein, plaintiff KEHOE served as President, Chief Operating Officer and ultimately Chief Executive Officer for PANORAMA FLAT/PANORAMA LABS and plaintiff URQUHART served as the Chief Financial Officer for PANORAMA FLAT/PANORAMA LABS.

65.    For their part, the plaintiffs faithfully and fully performed all duties required or incumbent upon them in accordance with the terms of the afore-mentioned agreements.

66.    In light of the above, PANORAMA FLAT/PANORAMA LABS never terminated the KEHOE and URQUHART Agreements in accordance with the required notice terms.

67.    Upon information and belief, all of the above-named defendants knew of and participated in the breach of contract and wrongful acts set forth at length herein. Upon further information and belief, the defendants, directly or indirectly, transacted business in the State of

New York on a regular and persistent basis, established offices in New York, and fully availed themselves of the benefits of New York and American law.

68.    Upon information and belief, defendants PANORAMA FLAT and PANORAMA LABS acted interchangeably as one integrated company, through identical officers and directors, each acting as agent for the other in all dealings with and representations to the plaintiffs.

69.    Upon information and belief, under the prevailing and applicable law governing the parties, the remaining defendants are directly liable for the acts of fraud, misrepresentation and deceit perpetrated against the plaintiffs and alleged at length herein.

## COUNT I

## BREACH OF CONTRACT

70.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs "1" through "69" above.

71.    Upon information and belief, defendants breached their collective contractual obligations to the plaintiffs under the terms of the KEHOE and URQUHART Agreements by failing to provide adequate advance notice of termination; by failing to pay all compensation, fees, commissions, bonuses, benefits, stock options and other monies due under the respective agreements; by failing to engage in good faith negotiations for stock options;  by failing to issue or transfer stock options to the plaintiffs; by failing to exercise due diligence and best efforts in negotiating for stock options; and by otherwise failing to observe and perform the terms of the KEHOE and URQUHART Agreements referenced herein and annexed hereto.

72.    By virtue of the foregoing, plaintiffs have sustained monetary damages and plaintiffs' current and future business prospects, opportunities and financial success have been compromised, diminished and prejudiced.

73.    Plaintiffs have been damaged and each demands separate judgment against defendants in an amount to be determined at or before trial, but in no event less than one million dollars ($1,000,000.00) each, with interest at the legal rate and the costs, disbursements and legal fees incurred in this action.

## COUNT II

## FRAUD AND DECEIT

74.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs "1" through "73" above.

75.    The above described acts of misconduct committed by defendants against plaintiffs are incorporated herein by reference with the same force and effect as if more fully set forth at length.

76.    Upon information and belief, defendants knowingly and intentionally defrauded plaintiffs by inducing them to sign consulting/employment agreements promising stock options which defendants had no intention to ever deliver, convey, pay or negotiate for in good faith as evidenced by the utter lack of discussion, meetings, correspondence and the timing of the terminations effectuated by these defendants.

77.    Upon information and belief, the foregoing inducements and representations by defendants were false and untrue. In fact and in truth, defendants sought out and secured the plaintiffs' corporate experience and know-how on the representation and inducement that plaintiffs would serve as high-level executives and reap valuable stock options in a promising technological venture. In so doing, the defendants committed fraud in the inducement as to these plaintiffs.

78.    Upon information and belief, the representations made by defendants to plaintiffs were false, fraudulent and deceitful and were known to be false by defendants when made.

79.    Upon information and belief, all of the aforesaid representations by defendants were made for the purpose and with the specific intent of deceiving and defrauding plaintiffs and to induce plaintiffs in reliance thereon to believe defendants' representations as aforesaid.

80.    Upon information and belief, the foregoing misrepresentations, fraud and deceit were perpetrated by defendants with the specific intent to harm plaintiffs and to extract an unfair and illegal advantage from plaintiffs.

81.    Upon information and belief, plaintiffs believed in the unqualified good faith, best efforts and due diligence pledged by defendants and that the aforesaid statements and representations made by defendants with respect to the plaintiffs' contractual benefits, employment and stock options were true.  Plaintiffs reasonably relied on such representations and conduct to their personal and professional detriment.

82.    By reason of the aforesaid fraud and deceit perpetrated by defendants against plaintiffs, plaintiffs have been damaged and demand judgment against defendants in an amount not yet ascertainable but believed to be in excess of five million ($5,000,000.00) dollars each.

83.    By virtue of the intentional, willful, wanton and malicious acts of deceit and fraud perpetrated by defendants against plaintiffs, plaintiffs are entitled to punitive damages and hereby demand the same against defendants in the amount of five million ($5,000,000.00) dollars each.

## COUNT III

## BREACH OF IMPLIED COVENANTS
## OF GOOD FAITH, BEST EFFORTS AND FAIR DEALING

84.      Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs "1" through "83" above.

85.      Defendants specifically acknowledged their obligations to deal fairly with plaintiffs and to employ best efforts, due diligence and good faith with respect to performance of the aforesaid agreements and negotiation for the promised stock options.

86.      Defendants utterly failed and refused to exercise best efforts, good faith and fair dealing in performing their obligations under the terms of the respective agreements. Specifically, and without limitation, defendants failed and refused to provide plaintiffs requisite advance notice of termination; defendants failed and refused to pay plaintiffs separation and termination monies, commissions, fees and bonuses due; and defendants failed and refused to undertake any good faith actions to negotiate or even discuss the issuance of stock options to plaintiffs. Cognizant of their legal liability and yet confirming and evidencing their utter lack of good faith negotiations for such stock options, defendants issued a smoking-gun letter respecting such stock options literally one day before the stock-option deadline elapsed.

87.      In so doing, defendants violated implied covenants of good faith, best efforts and fair dealing in their conduct and actions towards the plaintiffs.

88.      Plaintiffs have been damaged and demand judgment against defendants in an amount to be determined at or before the trial in this matter, but in no event less than one million dollars ($1,000,000.00) each, with interest, costs, disbursements and attorney's fees incurred in this action.

<u>COUNT IV</u>

**TORTIOUS INTERFERENCE WITH**
**<u>BUSINESS AND CONTRACTUAL RELATIONS</u>**

89.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs "1" through "88" above.

90.     The above described acts of misconduct committed by defendants against plaintiffs are incorporated herein by reference with the same force and effect as if more fully set forth at length.

91.     Defendants PANORAMA LABS, SYN, ATHANS, SPENCELEY, RIEBE and EIR, tortiously interfered with and obstructed performance of the contractual agreements between PANORAMA FLAT/PANORAMA LABS and the plaintiffs by recommending, condoning, effectuating, approving of and facilitating the wrongful termination of plaintiffs' agreements, including the non-issuance and non-negotiation of stock options to the plaintiffs.

92.     As a consequence of the foregoing, plaintiffs have been damaged and demand judgment against defendants in an amount to be determined at or before the trial in this matter, but in no event less than one million ($1,000,000.00) dollars each, with interest, costs, disbursements and attorney's fees incurred in this action.

<u>COUNT V</u>

**<u>PRIMA FACIE TORT</u>**

93.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs "1" through "92" as if more fully set forth herein.

17

94. The above described acts of misconduct committed by defendants against plaintiffs are incorporated herein by reference with the same and effect as if more fully set forth at length.

95. Upon information and belief, all of the foregoing wrongful acts were committed between January 1, 2004 and the present.

96. Upon information and belief, the above-described acts were committed willfully, wantonly and maliciously, without reasonable or probable cause and collectively set forth a legal pattern and cause of action sustaining *prima facie* tort in the State of New York and under Western Australian law.

97. Upon information and belief, in committing and perpetrating the above-described acts, the sole motivation of the defendants was "disinterested malevolence".

98. The above-described acts perpetrated by defendants were without legal or social justification.

99. The above-described acts perpetrated by defendants were performed with the deliberate and calculated intent of injuring the present and prospective contractual rights and business opportunities of the plaintiffs.

100. By reason of the foregoing acts perpetrated by defendants, plaintiffs have sustained special damages which include, but are not limited to, the following: (a) the loss of the option to secure stock ownership in a new and promising technological venture and (b) the loss of reputation and continuing professional interests within the business community.

101. As a result of the foregoing acts constituting *prima facie* tort in the State of New York and under the laws of Western Australia, plaintiffs request and are entitled to declaratory and equitable relief, including compensatory and punitive damages in an amount to be

determined at or before the trial in this matter, but in no event less than one million ($1,000,000.00) dollars each, with interest, costs, disbursements and attorney's fees incurred in this action.

**COUNT VI**

**BREACH OF FIDUCIARY DUTIES**

102.    Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through "101" with the same force and effect as if more fully set forth at length herein.

103.    Upon information and belief, a relationship of trust and confidence existed between defendants and plaintiffs KEHOE and URQUHART.

104.    Upon information and belief, defendants recruited plaintiffs as high-level executives and management team members in a new venture with the promise of shared equity ownership.  Consequently, a fiduciary relationship of trust, mutual cooperation and financial and professional interdependence existed between and among plaintiffs and defendants.

105.    By virtue of this shared venture and the specialized knowledge gained through their relationship with plaintiffs, defendants owed and continue to owe to plaintiffs a fiduciary duty to protect their financial interests and provide undivided and unqualified loyalty in so doing.

106.    The above duty was and is imposed by operation of law and was also agreed upon expressly or impliedly by said defendants.

107.    By operation of law, and by agreement, the fiduciary duties and other obligations owed by defendants to plaintiffs require that defendants refrain, inter alia, from the following:

        (a)    compromising, interfering with, diverting or wasting the present or prospective interests, rights or benefits of plaintiffs;

(b)  deriving a personal profit at the expense of plaintiffs or misappropriating their present or prospective equitable interests;

(c)  usurping for their own benefit or advantage business opportunities rightly belonging to plaintiffs;

(d)  acquiring, converting or misappropriating property, assets or interests in which plaintiffs have an interest or a reasonable expectation of such interest; or

(e)  interfering with the performance of the parties' obligations under the agreements referenced herein;

108.    Upon information and belief, defendants breached their aforesaid obligations and duties to plaintiffs from January 1, 2004 to the present.

109.    Upon information and belief, defendants willfully, wantonly and maliciously breached their fiduciary duties and obligations to plaintiffs in the following manner:

(a)  purposely and knowingly in bad faith delaying any negotiations for stock options in the burgeoning companies;

(b)  purposely and knowingly inducing plaintiffs to enter consulting agreements which defendants had no intention to honor or fully perform; and

(d)  interfering with and violating plaintiffs' rights under the agreements set forth herein.

110.    Plaintiffs have been damaged and continue to be damaged by the foregoing acts perpetrated by defendants.

112.    Upon information and belief, the aforesaid acts perpetrated by defendants were committed between January 1, 2004 and the present.

113.    Specifically, without limitation, plaintiffs have been and continue to be damaged in the following manner:

(a)  complete loss or diminution of rights, interest and benefits in PANORAMA FLAT and/or PANORAMA LABS;

     (b)    loss of profits and interests in which such companies have an interest or expectation of an interest

     (c)    loss of career path and professional development; and

     (d)    loss of future economic benefits as a result of the foregoing.

114.    The conduct and acts of the aforesaid defendants were and are intentional, willful, wanton and malicious.

115.    Plaintiffs requires equitable, injunctive and other relief from the court and monetary damages in an amount not yet ascertainable but believed to be in excess of one million ($1,000,000.00) dollars each.

116.    By reason of the intentional, willful, wanton and malicious acts complained of, plaintiffs are entitled to and hereby demand punitive damages from defendants in the amount of five million ($5,000,000.00) dollars each.

## COUNT VII

## DECLARATORY JUDGMENT

117.    Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through "116" with the same force and effect as if more fully set forth at length herein.

118.    Upon information and belief, at or about the time each plaintiff signed his agreement with PANORAMA FLAT, the defendants singularly or collectively represented that the "PANORAMA" companies would soon be firmly established in the State of New York; that operations would be concentrated in the United States; that "offshore" entities were also contemplated for tax reasons; that Western Australian venue and law provisions in the agreements would be irrelevant and not controlling; that the venue and forum selection

provisions in the agreement were otherwise meaningless and not controlling; and that new agreements would quickly replace the agreements actually signed by the plaintiffs.

119.    In reliance upon such representations and inducements, plaintiffs executed agreements purportedly fixing venue in the province of Western Australia in the Country of Australia, literally the opposite side of the world from the place plaintiffs would actually render services and performance under the agreements.

120.    Defendants' representations were again deceitful, fraudulent and calculated to injure and harm the plaintiffs and to extract some illegal advantage at their expense.

121.    A justiciable controversy and dispute exists between plaintiffs and defendants for which no prior relief has been sought.

122.    Pursuant to 28 U.S.C. §§ 2201 and 2202, the law of the State of New York, the Federal Rules of Civil Procedure and/or the laws of Western Australia plaintiffs are entitled to and hereby demand a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to this justiciable controversy.

123.    Plaintiffs specifically request that the Court render a declaratory judgment as follows:

            a)      declaring that defendants intentionally and/or negligently breached their respective contractual obligations to the plaintiffs;

            b)      declaring the extent and amount of plaintiffs' direct and consequential damages, including all rights and interests in the defendant companies, including stock ownership, stock dividends, accounts receivable, income, distributions, bonuses, fees, commissions or other income accruing, or which would have accrued to plaintiffs' benefit but for the wrongful acts and conduct of the defendants;

c)    declaring that the venue and law-fixing provisions in the referenced agreements are null, void, unconscionable, overreaching, against public policy, the product of fraud and deceit or fraudulent inducement, and otherwise unenforceable;

d)    declaring that New York law applies to all claims and legal issues presented; and

e)    declaring and awarding such other and further relief deemed just and proper in light of the conduct of these defendants.

## COUNT VIII

## ACCOUNTING

124.    Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through "123" with the same force and effect as if more fully set forth at length herein.

125.    Upon information and belief, the conduct of defendants, as described above, has been and is solely for the purpose of depriving plaintiffs of assets, rights, business interests, and other interests, monies, rights and interests cognizable at law and equity.

126.    Upon information and belief, the actions and conduct of defendants, as alleged herein, are not in the interests of plaintiffs, but are completely antagonistic to the best interests of plaintiffs.

127.    Plaintiffs have no adequate equitable remedy and a full accounting from defendants is necessary to determine the nature, quality and extent of damages suffered in and to plaintiffs.

128.    Plaintiffs request judgment, in addition to the claims and relief set forth above, compelling defendants to account for and disclose all income, expenses, distributions, and ownership information concerning defendant companies and all financial statements, balance

sheets, cash flow statements, tax returns, tax filings, governmental filings and investor information with respect to all interests in the defendant companies from January 1, 2004 to the present.

### COUNT IX

### PROMISSORY ESTOPPEL/DETRIMENTAL RELIANCE

129.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "128" as if more fully set forth herein.

130.     To induce the plaintiffs to work for PANORAMA FLAT/PANORAMA LABS, defendants promised to employ the plaintiffs as high-level executives in the positions of Chief Operating Officer and Chief Financial Officer and offered plaintiffs competitive salaries, bonuses, commissions and participation in the equity ownership of the "PANORAMA" family of companies.

131.     In reliance on the representations made by defendants , the plaintiffs entered into discussions, negotiations and ultimate contractual agreements with defendants and made arrangements to cut off all other employment and devote their full-time resources, know-how and talents to the common venture contemplated by defendants.

132.     Reasonably relying upon the aforesaid representations made by defendants, the plaintiffs changed their legal, equitable, financial and professional positions and have been damaged accordingly.

133.     As realleged herein, defendants have failed and refused to perform and/or honor their representations and obligations to the plaintiffs.

134.    As a result of the foregoing, the plaintiffs have been damaged and demand judgment against defendants in an amount to be determined at or before the trial in this matter, but in no event less than one ($1,000,000.00) million dollars each.

WHEREFORE, plaintiffs respectfully request that this Court:

(a)    accept jurisdiction over all the claims set forth herein;

(c)    hear and determine plaintiffs' monetary, injunctive and equitable claims;

(d)    declare the conduct engaged in by defendants to be in violation of plaintiffs' rights;

(e)    enjoin defendants from engaging in such conduct presently or in the future;

(f)    award plaintiffs compensatory and punitive damages in the amounts set forth in the above claims, or in such amounts to be determined at or before the trial of this action;

(g)    award plaintiffs costs and attorneys' fees; and

(h)    grant a jury trial on all issues triable by a jury

(i)    grant such other relief as this Court may deem just and proper.

Dated: Newburgh, New York
       April 10, 2007

Respectfully submitted,

TARSHIS, CATANIA, LIBERTH,
MAHON & MILLIGRAM, PLLC

By: _____

Richard M. Mahon, II (RM-9260)
Attorneys for Plaintiffs
One Corwin Court

P.O. Box 1479
Newburgh, New York 12550
Tel. No. (845) 565-1100